# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| NANCY E. YOUMANS, | ) | |
| | ) | No. 14 CV 7609 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | July 5, 2016 |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Nancy Youmans filed an application for Supplemental Security Income ("SSI") alleging that she is disabled by a learning disorder, psychiatric ailments, ear problems, and a cleft lip. After the Commissioner of the Social Security Administration denied her application, Youmans filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Youmans's motion for summary judgment is denied and the government's is granted:

## Procedural History

Youmans applied for SSI in September 2011 claiming disability because of a learning disability, post-traumatic stress disorder ("PTSD"), depression, schizophrenia, ear and hearing problems, and a cleft lip.[1] (Administrative Record ("A.R.") 138, 156.) After her claim was denied initially and upon reconsideration,

---

[1] Youmans has had eight prior filings for disability benefits, but these applications are not at issue here.

(id. at 80-83), Youmans timely requested and was granted a hearing before an Administrative Law Judge ("ALJ"), (id. at 96, 103). Represented by counsel, she appeared and testified before the ALJ on December 6, 2012. (Id. at 29–79.) On January 23, 2013, the ALJ issued a decision denying Youmans's application. (Id. at 15, 24.) When the Appeals Council declined her request for review, (id. at 6-11), the ALJ's denial of benefits became the final decision of the Commissioner, *see Minnick v. Colvin,* 775 F.3d 929, 935 (7th Cir. 2015); 42 U.S.C. § 405(g). After receiving an extension of time from the Appeals Council, (A.R. 1), Youmans filed this lawsuit seeking judicial review of the Commissioner's decision, (R. 1), and the parties consented to this court's jurisdiction, (R. 7); *see* 28 U.S.C. § 636(c).

## Background

### A. Medical Evidence

Youmans was 32 years old at the time of her December 2012 hearing. In 2006 she underwent a psychological assessment with Mark B. Langgut, Ph.D., a licensed clinical psychologist. (A.R. 224-26.) Dr. Langgut reviewed then-available medical records and conducted a mental status examination and a Wechsler Adult Intelligence Scale III ("WAIS-III") test. (Id.) He characterized Youmans's thought processes as having "slowed speed, poor coherence, and moderately increased suggestibility" with some mild obsessive ideas, ruminative ideation, and phobias. (Id. at 226.) Her full scale IQ score was 79, which was in the eighth percentile and considered to fall within the borderline range of intellectual ability. (Id.)

Most of the medical records document Youmans's mental health treatment from February 2008 to July 2010, (id. at 235-360), during which time she was diagnosed with a mood disorder, an anxiety disorder, relational problems, and dependent personality disorder, (id. at 235, 292). She received counseling from licensed clinical social worker Diane Funk for her depression, anxiety, and related issues. (Id. at 255-69.) In March 2008, Dr. Atul Sheth, M.D., prescribed Celexa, which Youmans admitted to stopping and restarting because of her financial limitations. (Id. at 237.) In May 2009, when she reported an increase in panic attacks, Dr. Sheth increased her dose of Celexa and added Ativan to her regimen. (Id. at 282.) That same month Youmans reported that she had been experiencing flashbacks to past trauma, but that her medications were helping. (Id. at 316.)

At a second psychological assessment with Dr. Langgut in May 2009, Youmans reported that she was experiencing depression, nightmares, and flashbacks. (Id. at 231.) Testing indicated a full-scale IQ of 67, placing her in the first percentile, or what Dr. Langgut described as "in the mentally deficient range of intellectual ability." (Id. at 232.) He noted that Youmans "appear[ed] to struggle with many aspects of day to day life and [was] apt to feel overwhelmed by modest tasks." (Id.)

In July 2009, Funk noted that Youmans was experiencing panic attacks. (Id. at 294.) In September 2009, Youmans was discharged from treatment because of noncompliance, (id. at 309, 313), but she returned to receiving mental-health treatment in November 2009, (id. at 317). She was staying at a homeless shelter

and lacked any means to pay for her treatment. (Id. at 322.) She also reported feelings of hopelessness, low energy and motivation, and irritability. (Id.) A Mental Status Exam performed on November 6, 2009, noted that she exhibited a poor recent memory and an inability to concentrate. (Id. at 324.) Evaluators confirmed diagnoses of PTSD, anxiety, mild recurrent major depressive disorder, and dependent personality disorder. (Id. at 333.)

The following month, on December 23, 2009, Youmans followed up with Dr. Sheth. (Id. at 345-47.) Dr. Sheth wrote that Youmans had a history of depression, anxiety, and obsessive-compulsive disorder, and was experiencing social phobia. (Id. at 345.) Youmans reported anxiety that caused her to shake and to have pains in her stomach and legs, and complained of slight depression. (Id.) Dr. Sheth recommended that she resume Celexa and referred her for case management and psychiatric services. (Id. at 347, 354.)

On April 30, 2010, clinical psychologist Mary M. Zashin, Ph.D., performed a psychological assessment of Youmans in connection with proceedings unrelated to her SSI application. (Id. at 361-401.) Dr. Zashin interviewed Youmans and performed several psychological and cognitive tests, including the WAIS-III. (Id. at 362-63.) Dr. Zashin described Youmans as "[a]nxious, depressed, and beset with self-critical thoughts" and "plagued by" tension that limits her ability to think and concentrate. (Id. 374.) She noted that Youmans "often withdraws" and sometimes expresses discontent through "incomplete task performance, passive-aggressive noncompliance, evasiveness, procrastination, purposeful inefficiency,

misunderstanding, and 'forgetting.'" (Id. at 375.) Dr. Zashin observed that Youmans met the criteria for major depressive disorder, generalized anxiety disorder, and avoidant personality disorder. (Id. at 394.) She assessed a then-current GAF score of 45.[2] (Id. at 401.)

On the intelligence test administered by Dr. Zashin, Youmans had a full scale IQ score of 86, which was in the 18th percentile for the adult population as a whole. (Id. at 389.) This led Dr. Zashin to conclude that Youmans "has the cognitive ability to enable her to meet the demands of adult life," though she "may have some difficulty with tasks that call on her weaker nonverbal abilities," and that her "weakness in mental control and auditory memory may sometimes hinder her." (Id. at 390.) Youmans scored at the 11th-grade level in reading and at the 10th-grade level in mathematics, and Dr. Zashin opined that "there is no evidence of specific learning disabilities in these two areas of basic academic skills." (Id.) Even so, Dr. Zashin ultimately concluded that at her then-current level of functioning, Youmans was "unable to meet most of the daily requirements of adult life," without "extensive support and comprehensive treatment." (Id. at 397.) While her assessment did not provide any analysis of her capacity to perform work-related activities, Dr. Zashin did opine that Youmans "could benefit from job or vocational

_____

[2] Although the American Psychiatric Association discontinued the use of the GAF metric in 2013, see Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013), the GAF score was still in use at the time of Youmans's evaluations noted in this record. *See Gully v. Colvin*, 593 Fed. Appx. 558, 561 n.2 (7th Cir. 2014). A GAF score between 41 and 50 indicates "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

counseling" and from training to help her "develop the skills she needs to become financially more self-supporting." (Id. at 398-99.)

A note dated July 28, 2010, indicates that Youmans was again discharged from her mental-health treatment for noncompliance. (Id. at 355.) She had failed to attend psycho-social rehabilitation sessions, a type of group therapy, since the beginning of June. (Id.)

On November 22, 2011, Youmans met for a third time with consultative examiner Dr. Langgut, who performed an updated psychological assessment in connection with her current application for benefits. (Id. at 455-58.) Dr. Langgut again diagnosed Youmans with having symptoms of PTSD. (Id. at 458.) He noted that even though Youmans suffers from depression, she did not exhibit significant depressive symptoms at that time. (Id. at 455, 457.) Her thought processes were of average coherence and normal speed with a mild degree of ruminative ideation and no obsessive ideas, delusions, phobias, or hallucinations. (Id. at 458.) She had the capacity for intact judgment but limited abstract reasoning skills and impaired insight into her own situation. (Id. at 457-58.) She was living with her husband and was able to perform household chores, including cleaning the house, doing the laundry, shopping, and cooking. (Id. at 456-57.)

State agency reviewer Dr. Elizabeth Kuester prepared a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Form on December 16, 2011. (Id. at 437-53.) Based on a review of Youmans's treatment records and Dr. Langgut's reports, Dr. Kuester concluded that Youmans has a learning

disorder/borderline intellectual functioning and mild anxiety characterized by recurrent and intrusive recollections of a traumatic experience. (Id. at 437-38, 442.) Dr. Kuester found that Youmans has the following limitations: mild restrictions in her activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (Id. at 447.) She opined that diagnoses of dependent personality disorder and mental retardation are not substantiated in the available record. (Id. at 449.) She rejected the IQ scores from Dr. Langgut's 2009 assessment, which were 10 or more points lower than those obtained in 2006, because they were "not consistent with the history or her level of her adaptive functioning" and with her most recent mental status exam by Dr. Langgut. (Id.)

As to Youmans's mental RFC, Dr. Kuester opined that she is "moderately limited" in the following six work-related mental capacities: the abilities to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to set realistic goals or make plans independently of others. (Id. at 451-52.) She opined that Youmans has no "marked" limitations in work-related mental abilities and is "not significantly limited" in any other capacity. (Id.) Dr. Kuester explained that despite Youmans's learning disorder/borderline intellectual functioning, she has

"relatively mild symptoms currently."  (Id. at 453.)  She opined that Youmans can "learn and perform simple, routine tasks adequately with ordinary supervision" and can "relate acceptably to the extent typical of simple work," making "basic work decisions" and adapting to a work routine.  (Id.)

In February 2012, medical consultant R. Leon Jackson, Ph.D., agreed with Dr. Kuester's assessments, finding Youmans "capable of simple unskilled tasks with some social limits."  (Id. at 462.)  Dr. Jackson noted that Youmans had provided no sources to support her assertion in her request for reconsideration that her conditions had worsened since December 1, 2011.  (Id.)  He determined that absent any additional medical evidence, the psychological consultative exam performed in November 2011 by Dr. Langgut still applied to describe her condition on the date she claims her condition declined.  (Id.)

## B.    Hearing Testimony

At her December 2012 hearing before the ALJ, Youmans testified that she had difficulty keeping her former job because of anxiety about completing and initialing items on a task list she received each day.  (A.R. 42.)  She also felt stressed if asked to do something different from what was on the list.  (Id.)  She testified that she was unable to complete the expected amount of work in a day because she would get distracted and become upset about events in her life.  (Id. at 43-44.)  There were also times when she would not come into work because of depression, but that was not often the case because she knew she had to report for work.  (Id. at 44.)

Youmans testified that she now lives with her husband, who does most of the household chores, but she is able to take out the garbage, wash dishes, and sweep. (Id. at 44-48.) She fears making mistakes. (Id. at 49-50.) She no longer takes Celexa or Ativan because they made her feel ill. (Id. at 51.) She does not see a psychiatrist or psychologist because she lacks the financial means to do so, but has not sought treatment at a free clinic. (Id. at 52.)

A vocational expert ("VE") testified regarding the kinds of jobs available for a person of Youmans's age, education, and work experience with the following restrictions: she can perform only simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements and involving only simple work-related decisions with few, if any, workplace changes; she can have only brief and superficial interactions with the public and co-workers; and she needs close supervision, defined as having a supervisor check her work four times a day. (Id. at 73-74.) The VE explained that such a person could work as a machine feeder. (Id. at 74.) The ALJ then asked the VE to assume that such an individual should also avoid workplace hazards such as moving machinery, unprotected heights, and motor vehicles. (Id.) The VE opined that such a person could still work as a machine off-bearer, machine operator, polisher, or fastener. (Id. at 75.) However, if she were off task for 20 percent of the workday, or took two unexcused absences per month, no jobs would be available. (Id. at 76-77.)

**C.    The ALJ's Decision**

On January 23, 2013, the ALJ issued a decision finding that Youmans is not disabled.  (A.R. 15-24.)   Applying the required five-step sequence for assessing disability, *see* 20 C.F.R. § 416.920(a)(4); *Stepp v. Colvin*, 795 F.3d 711, 716 (7th Cir. 2015), the ALJ first found that Youmans has not engaged in substantial gainful activity since September 7, 2011, (A.R. 17).   At step two the ALJ found that Youmans has the following severe impairments: learning disorder; depression; anxiety/PTSD; and a schizoaffective disorder.   (Id.)   At step three the ALJ determined that Youmans does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (Id.)   The ALJ then determined that Youmans retains the residual functional capacity ("RFC") to perform a full range of work at all exertion levels, but with the following non-exertional limitations: she must avoid exposure to hazards; she is limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements and requiring only simple work-related decisions; she can have few, if any, work place changes; she is limited to brief and superficial interactions with the public and occasional interactions with co-workers in jobs that do not require her to work on tandem tasks; and she requires close supervision, defined as having a supervisor check her work four times per workday.  (Id. at 19.)   The ALJ found at step four that Youmans has no past relevant work.  (Id. at 22.)   At step five, based on her age, education, work experience, and RFC, the ALJ concluded that Youmans

10

can perform jobs existing in significant numbers in the national economy, including machine off-bearer, polisher, and fastener. (Id. at 23.) Accordingly, the ALJ concluded that Youmans is not disabled. (Id. at 24.)

## Analysis

Youmans argues that the ALJ's decision must be reversed because, according to her, he failed to consider Listing 12.05(C), performed a faulty assessment of her RFC, failed to build a logical bridge from the evidence to his conclusion, and wrongly concluded at step five that Youmans could adjust to work that exists in significant numbers in the national economy. This court reviews the ALJ's decision only to ensure that it is supported by substantial evidence, defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stepp*, 795 F.3d at 718 (internal quotation omitted). Under that standard, the court will not substitute its judgment for the ALJ's or reconsider evidence. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). At the same time, the court will not "simply rubber-stamp the Commissioner's decision without a critical review of the evidence." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Instead, the court's role is to ensure that the ALJ built a "logical bridge from the evidence" to his conclusion that the claimant is not disabled, explaining "why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (internal quotation and citation omitted).

## A.    Listing 12.05(C)

In challenging the ALJ's step-three analysis, Youmans argues that the ALJ "committed substantial, harmful error by completely failing to address . . . Listing 12.05(C)," the listing for mental retardation.  (R. 13, Pl.'s Mem. at 8.)  A claimant can meet Listing 12.05(C) by having a valid IQ score from 60-70 together with "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  *See* 20 C.F.R. Pt. 404, Subpt.P, App. 1 § 12.05(C). Youmans contends that her history of attending special education classes and her full scale IQ score of 67 as tested by Dr. Langgut in 2009, together with her other impairments, should have led the ALJ to consider Listing 12.05(C).  (R. 13, Pl.'s Mem. at 8-9.)

At step three, however, the burden is on the claimant "to present medical findings that match or equal in severity all the criteria specified by a listing." *Knox v. Astrue,* 327 Fed. Appx. 652, 655 (7th Cir. 2009).  Also, a party who is represented by counsel at the administrative hearing stage "is presumed to have made [her] best case before the ALJ."  *Pepper v. Colvin,* 712 F.3d 351, 367 (7th Cir. 2013) (quoting *Skinner v. Astrue,* 478 F.3d 836, 842 (7th Cir. 2007)).  But Youmans's counsel did not ask the ALJ to consider Listing 12.05 at the hearing.  Her counsel instead advocated for Listing 12.04.  When questioned by the ALJ as to whether Youmans's impairments met any listing other than 12.04, Youmans's counsel replied, "I'd say that would be the only listing."  (Id. at 36.)  Based on that assertion, the ALJ wrote that Youmans's counsel "conceded other than 12.04 no listings met," and therefore

"deemed waived" any argument regarding any other listing. (Id. at 18.) In her arguments to this court, Youmans ignores this aspect of the ALJ's finding, characterizing the ALJ's failure to address Listing 12.05 as an oversight rather than the result of counsel's representation that the only relevant Listing was 12.04. *See Levins v. Astrue*, No. 09-C-1067, 2010 WL 1881452, at *6 (E.D. Wis. May 10, 2010) (noting that an ALJ is not required to consider every conceivable applicable listing when a claimant's counsel refers to only a particular listing); *see also Watkins v. Colvin*, 3:12-CV-491, 2014 WL 683849, at *8 (N.D. Ind. Feb. 21, 2014) (noting that counsel's statement that a particular listing does not apply usually prevents claimant from later asserting the opposite). Because Youmans has not addressed the ALJ's reason for not considering Listing 12.05(C)—namely, her attorney's representation that only Listing 12.04 is relevant—she has not shown that the ALJ committed reversible error in excluding Listing 12.05(C) from his step-three analysis.

Even if the ALJ were obligated to consider Listing 12.05(C) despite her attorney's concession at the hearing, Youmans has not met her burden of showing that her intellectual impairment meets the criteria for that listing. An ALJ need not accept an IQ score as "valid" in the face of conflicting evidence. *See Strunk v. Heckler*, 732 F.2d 1357, 1360-61 (7th Cir. 1984); *see also Williams v. Colvin*, No. 1:12-CV-01715-SEB-DKL, 2014 WL 1328152, at *5 (S.D. Ind. March 31, 2014) (noting that an ALJ "may discount [IQ] scores inconsistent with his determination of the claimant's intellectual functioning based on other available evidence, and he

may resolve discrepancies between different scores"). Here, Youmans underwent three sessions of IQ testing as an adult, which yielded IQ results of 79 in 2006, 67 in 2009, and 86 in 2010. The ALJ did consider Youmans's IQ result from 2009, but he rejected it as an outlier as it was more than 10 points lower than her next-lowest test result and was "inconsistent with . . . her level of adaptive functioning." (A.R. 22.) The ALJ cited as support for that assertion Dr. Kuester's findings that the 2006 IQ score was a more accurate representation of her cognitive functioning. (Id.) Because the court reviews the ALJ's decision as a whole, *see Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015), in light of the ALJ's rejection of the only IQ score that fell within the listings range, Youmans did not meet the threshold requirement of Listing 12.05(C). Accordingly, even if the ALJ should have considered Listing 12.05(C) despite Youmans's counsel's disavowal of any listing other than 12.04, the ALJ's failure to evaluate that listing here was harmless.

B.     **RFC Assessment**

Youmans's next two arguments challenge the ALJ's RFC findings. First, she asserts that the ALJ "selectively highlighted" certain evidence, ignoring parts of the record that conflict with his conclusions, including Dr. Langgut's May 2009 report and portions of Dr. Zashin's April 2010 report. (R. 13, Pl.'s Mem. at 9-10.) Although an ALJ need not discuss every piece of evidence in the file, he must "confront the evidence that does not support [his] conclusion and explain why that evidence was rejected." *Moore v. Colvin,* 743 F.3d 1118, 1123 (7th Cir. 2014.) The ALJ has done that here. He summarized Dr. Zashin's 40-page report, listed the diagnostic

findings, and quoted a portion of the report very similar to that which Youmans claims he ignored—the psychologist's finding that Youmans lacks the "financial resources, employment skills, social support, or environmental stability to care for herself . . . without assistance." (A.R. 21.) The ALJ also provided a thorough summary of Dr. Langgut's most recent report and highlighted the portions of his earlier reports that conflict with the ALJ's ultimate conclusions. (Id. at 21-22.) He then explained that he rejected Dr. Zashin's opinion regarding Youmans's prognosis and GAF score considering her functioning during the relevant period, from September 7, 2011, through her hearing date, and the other opinion evidence on file, including those of the consulting physicians. (Id. at 22.) Youmans's most recent psychological assessment and the opinions of the agency reviewers together provide substantial evidence to support this portion of the ALJ's decision.

Additionally, although neither examining source rendered any opinion specific to Youmans's work-related capacities, it is clear that the ALJ took many of their findings into account in assessing a restrictive mental RFC. State consultant Dr. Kuester found Youmans "moderately limited" in only six of twenty work-related mental capacities. (Id. at 451-52.) The ALJ formulated an RFC that accounted for those limitations and more, adding such restrictions as the need for close supervision and the need for a job with few, if any, workplace changes. Youmans has not shown that the ALJ's RFC assessment fails to account for any work-related capacity compromised by her diagnosed disorders, poor social skills, and tendencies to "struggle with many aspects of day to day life" and to "feel overwhelmed by

modest tasks"—the portions of the reports she alleges the ALJ ignored.  (R. 13, Pl.'s Mem. at 10.)  The ALJ limited Youmans to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements and requiring only simple work-related decisions, with no more than brief and superficial interactions with the public and occasional interactions with co-workers with close supervision.  (A.R. 19.)   These restrictions indicate that the ALJ recognized Youmans's limitations and that he took them into account in considering whether there are jobs she can perform.

Second, Youmans criticizes the ALJ's RFC assessment for failing to include the assumptions that she will be off task 20 percent of the time and absent more than 14 days per year.  (R. 13, Pl.'s Mem. at 10-11.)  Youmans's argument fails because she has not pointed to any evidence in the record demonstrating that those restrictions apply to her.  Youmans's reliance on *Punzio v. Astrue,* 630 F.3d 704 (7th Cir. 2011), is misplaced.   In *Punzio*, the claimant's treating psychiatrist had provided a function-by-function assessment of her work-related capacities, which included limitations that were excluded from the ALJ's RFC assessment.  *Id.* at 709-10.  Here, by contrast, no treating source has opined as to her work-related functioning, let alone opined that she would be off-task 20 percent of the time or that she would be absent from work 14 days per year.  The consulting physicians opined that Youmans can perform simple, routine tasks with ordinary supervision.  Because the ALJ took these opinions into account and assigned an RFC that is even

more restrictive than those suggested by the only medical opinions in the record, Youmans has not shown that the ALJ erred in assessing her mental RFC.

The court notes that Youmans argues for the first time in her reply brief that the limitation to simple, routine, and repetitive tasks with additional limitations on supervision and social contacts do not capture her moderate limitations in concentration, persistence, or pace. (R. 23, Pl.'s Reply at 4.) As an initial matter, Youmans improperly filed her reply without seeking leave of the court, as instructed in this court's order dated November 17, 2014. (R. 10.) Moreover, Youmans has waived this argument by raising it only in her reply brief. *See Bodenstab v. County of Cook*, 569 F.3d 651, 658 (7th Cir. 2009); *Williams v. Colvin*, 14 CV 904, 2015 WL 4607649, at *3 (N.D. Ill. July 31, 2015). The waiver rule exists to prevent a party from depriving its opponent of the opportunity to brief an issue, *see Williams*, 2015 WL 4607649, at * 3, which is what Youmans has done here. Even assuming for the sake of argument that Youmans had not waived this argument, although the Seventh Circuit has held that normally an RFC limiting a claimant to simple, routine work does not properly capture moderate limitations in concentration, persistence, or pace, *see Yurt v. Colvin*, 758 F.3d 850, 858-59 (7th Cir. 2014), it has also recognized that in some situations where a consulting physician translates a finding of moderate limitations in concentration, persistence, or pace into an RFC for simple, routine work, the ALJ may rely on that opinion in assigning the RFC, *see Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015) (noting that "in some cases, an ALJ may rely on a doctor's narrative RFC, rather than the checkboxes, where

that narrative adequately encapsulates and translates those worksheet observations"); *Milliken v. Astrue*, 397 Fed. Appx. 218, 222 (7th Cir. 2010). Here the ALJ relied on the opinion of Dr. Kuester, who noted that despite her limitations in concentration, persistence, or pace, Youmans can "learn and perform simple, routine tasks" with ordinary supervision and can adapt adequately to a work routine involving simple work. (A.R. 22, 453.)

## C.    Weighing of Evidence

Youmans also argues that the ALJ's RFC assessment is erroneous because, according to her, he improperly evaluated her credibility and the opinion evidence.[3] (R. 13, Pl.'s Mem. at 11-13.) In evaluating a claimant's symptoms the regulations require the ALJ to first determine whether the claimant has an underlying medically determinable impairment that could reasonably be expected to produce her symptoms and to then "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." SSR 16-3p at *2; *see also* 20 C.F.R. § 416.929. Here, despite his statement that he did not find her "credible," the ALJ took Youmans's self-reported symptoms into account in formulating his RFC assessment. In her testimony, Youmans described her work-related limitations as a

---

[3]  The Social Security Administration recently issued a Social Security Ruling ("SSR") updating its guidance about evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). The new SSR 16-3p supersedes SSR 96-7p, eliminating the term "credibility" from the Administration's sub-regulatory policies in favor of a focus on symptom evaluation. *Id.* at *1. But the factors that the ALJ must consider in evaluating the intensity of symptoms remain the same under the new guidelines. *Id.* at *7.

tendency to get "sidetracked," and feelings of stress and anxiety when confronting a long to-do list or when asked to complete tasks not on that list. (A.R. 42-44.) The ALJ accounted for these symptoms by limiting her to simple, routine, and repetitive tasks, free of fast-paced production requirements or tandem tasks, and simple work-related decisions with close supervision, in an environment with few if any workplace changes. (Id. at 19.) In her written testimony, Youmans also stated that she has difficulty getting along with others because she does not like socializing, symptoms that the ALJ took into account in limiting her to only brief and superficial interactions with the public and occasional interactions with coworkers. (Id. at 19, 171.) Youmans now argues in her brief that she "would not come into work because she felt too depressed," and that she has approximately five panic attacks a week, but offers no evidence to substantiate these claims, particularly with respect to the period since the date of her application. (Compare R. 13, Pl.'s Mem at 11, with A.R. 44 (when she was employed, Youmans "mainly" went to work despite her depression) and id. at 231 (her depression in 2009 was exacerbated by her homelessness at the time).) Moreover, contrary to Youmans's argument, the ALJ did give "concrete reasons" for finding her symptoms less severe than she described. The ALJ walked through the factors for symptom evaluation set forth in 20 C.F.R. § 416.929, and found that they did not fully support her testimony. (A.R. 20.) For example, the ALJ found that Youmans had not taken any medication for over three years and that she had been discharged from therapy programs based on her failure to attend. (Id.) The ALJ acknowledged Youmans's testimony that she

lacked insurance or the funds for treatment, but noted that she had not sought out a free clinic for treatment. (Id.) The ALJ considered Youmans's daily activities, including her ability to clean, do laundry, shop, and cook. (Id.) Those are valid bases on which an ALJ may discount a claimant's testimony regarding symptom severity. *See Berger*, 516 F.3d at 546 (noting that even "harsh" evaluations of a claimant's testimony "will stand as long as there is some support in the record" (internal quotations and citation omitted)).

## D.    Step-Five Determination

Youmans's final argument is that the ALJ came to the wrong conclusion in finding that she could work, given her past failed work attempts. (R. 13, Pl.'s Mem. at 13.) With this contention, Youmans attempts to circumvent the five-step process and to secure a finding of disability without any analysis of the ALJ's assessment of her RFC. The ALJ properly applied the five-step process, assessed an unusually restrictive mental RFC, and with the aid of VE testimony, found that there are jobs that Youmans can perform despite her limitations. Youmans has not developed any argument as to why a person with the RFC the ALJ assigned to her could not perform the three jobs that the VE identified at the hearing.[4] Accordingly, the court will not disturb the ALJ's step-five finding.

---

[4] The court notes that the ALJ included in the RFC a restriction against performing tandem tasks, but did not include that restriction in the hypothetical questions posed to the VE. (A.R. 19, 73-74.) Neither party has acknowledged this discrepancy, nor has Youmans raised this as a potential reversible error in either of her briefs. There are portions of the hearing transcript that are marked as "inaudible," (id. at 74-75), so it is possible that the ALJ included the restriction but it was not recorded. It is also possible that the positions the VE cited do not require

## Conclusion

For the foregoing reasons, Youmans's motion for summary judgment is denied, the government's is granted, and the final decision of the Commissioner denying benefits is affirmed.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**

---

tandem tasks.  Because neither party raised the issue, the court will not address it further.